## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SAMANTHA HALLMAN,

     Plaintiff,

v.

Hon. TRAVIS REEDS, in his official capacity as
Chief Judge of Michigan's 52nd District Court;
Hon. LISA L. ASADOORIAN, in her official
capacity as a judge of the third division of
Michigan's 52nd District Court; and Hon.
JEFFERY S. MATIS, in his official capacity as
Chief Judge of Michigan's Sixth Circuit Court,

     Defendants.

Case No.

Hon.

## **COMPLAINT**

## INTRODUCTION

1.    Michigan is alone amongst state court systems in the Sixth Circuit in

allowing its courts to deny the public access to audio and video recordings that the

courts make of their proceedings.  This means that public advocacy organizations

cannot easily monitor what happens in courts.  It also means that attorneys often

cannot view or obtain recordings that could correct erroneous transcripts or provide

essential context for appellate review.  And it suppresses public engagement with

the courts, denying a critical method for the public to learn what happens in the

courtrooms and educate themselves as voters in anticipation of judicial elections. Such engagement with the judiciary also makes citizens more informed voters and advocates with regard to the political branches, as familiarity with the legal system informs legislative reform efforts as well.

2.      Taxpayer dollars are used throughout Michigan to create recordings of courtroom proceedings, but those same taxpayers are routinely denied access to the very recordings their hard-earned funds pay to create.  This lack of transparency violates the First Amendment by denying the public the right to access and disseminate records of critical judicial proceedings, many of which constitute the bedrock upon which a functioning democracy is built.

3.      Dr. Samantha Hallman's experience perfectly encapsulates the ways such policies undermine transparency and public trust and suppress speech and democracy in the process.  Dr. Hallman's brother was subjected to what she considered to be abusive conduct by a judge in the third division of Michigan's 52nd District Court ("the District Court").  In a subsequent civil lawsuit he filed in Oakland Circuit Court ("the Circuit Court") in which that same district court judge's demeanor in the hearing in question was at issue, Dr. Hallman's brother was denied access to an audio recording of the underlying District Court hearing pursuant to the District Court's local administrative order ("the District Court policy") denying public access to court recordings.  Dr. Hallman subsequently attempted to secure a

copy of the recording of the District Court hearing in order to inform the voting public about the judge's courtroom conduct and demeanor, but she was denied access to the recording pursuant to the same policy.  She also sought to obtain a recording of the Circuit Court hearing at which access to the District Court's recording was denied, in order to publicize to Oakland County's voters the government's stated rationale for the District Court's policy, how their tax dollars were being spent to defend this policy, and to demonstrate a dismissive tone within the courtroom.  Pursuant to the Circuit Court's own restrictive policy ("the Circuit Court policy") on court recordings, she was allowed to *view* a recording of the Circuit Court proceeding but was denied permission to disseminate the recording to other members of the public, legislators, and other policymakers in order to further her advocacy promoting open and transparent public access to courts in Michigan.

4.     This nation's tradition of courts being transparent and open to the public is one of the great strengths of our democracy and a critical way of promoting civic engagement and government accountability.  Accordingly, the First Amendment mandates that court records generally be open to the public.  It was once a civic expectation that the public would attend trials and directly engage with democratic governance by doing so.  That is not possible in the modern world, but providing the public with access to existing recordings of what happens in our courts is the closest modern analog to this historical practice.  The First Amendment requires that these

3

essential, taxpayer-funded recordings that reflect the functioning of our judicial system be available to interested Michiganders so they can understand what happens every day in Michigan's courtrooms.

## JURISDICTION AND VENUE

5.     Because this civil rights action arises under the United States Constitution, this Court has jurisdiction under Article III of the U.S. Constitution and under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

6.     Venue is proper under 28 U.S.C. § 1391(e) because the incidents, events, and occurrences giving rise to this action occurred in the Eastern District of Michigan and because all parties are domiciled in the Eastern District of Michigan.

7.     This Court is authorized to award the requested declaratory and injunctive relief under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201-2202, and the Court's equitable powers.

## PARTIES

8.     **Plaintiff Dr. Samanta Hallman** is both a researcher at the University of Michigan's School of Education, where her research is focused on postsecondary education in prisons, and a lecturer at the University of Michigan Dearborn's College of Education, Health, and Human Services, where she teaches research methods and statistics.  She holds a Ph.D. in psychology and social work and a masters degree in social work.  She has a high level of civic engagement both

through her professional work and in her personal life and is active in following judicial elections, monitoring the activity of state court judges, and advocating for candidates in local and statewide judicial elections.  She resides in Royal Oak, Michigan.

9.    **Defendant Travis Reeds** is the chief judge of Michigan's 52nd District Court, which is divided into four divisions, which collectively have jurisdiction over cases arising in several jurisdictions located in Oakland County, Michigan.  He is sued for injunctive and declaratory relief in his official administrative capacity as chief judge of the 52nd District Court, and thus the official responsible for promulgating and maintaining the District Court's policies relating to audio and video recordings.  In the alternative, he is sued in his judicial capacity for declaratory relief only.

10.    **Defendant Lisa L. Asadoorian** is a judge in the third division of Michigan's 52nd District Court.   She denied Plaintiff's request for an audio recording of proceedings that occurred in her court, pursuant to the District Court policy promulgated and maintained by Defendant Reeds.  She is sued for injunctive and declaratory relief in her official administrative capacity.  In the alternative, she is sued in her judicial capacity for declaratory relief only.

11.    **Defendant Jeffery S. Matis** is the chief judge of Michigan's Sixth Circuit Court, which has jurisdiction over cases arising in Oakland County (referred

to herein as "the Circuit Court" or the "Oakland Circuit Court"). He is sued for

injunctive and declaratory relief in his official administrative capacity as chief judge

of the Oakland Circuit Court, and thus the official responsible for promulgating and

maintaining the Circuit Court's policies relating to audio and video recordings. In

the alternative, he is sued in his judicial capacity for declaratory relief only.

## FACTUAL ALLEGATIONS

### I.  Legal Framework Governing Public Access to Recordings of Court Proceedings

#### A.  State-Level Rules in Michigan Relating to Access to Court Recordings

12.     The vast majority of judicial proceedings in Michigan's state courts

are recorded, either in audio or video format (or both).

13.     Michigan does not have a uniform statewide statute or court rule

clearly addressing when the public is entitled to access, copy, or disseminate audio

and video recordings that are made of courtroom proceedings.

14.     Rather, Michigan's court rules leave the question to each individual

court. Michigan Court Rule ("MCR") 8.119(F) states, "Court recordings . . . and

any other medium used or created in the making of a record of proceedings and kept

pursuant to MCR 8.108 are court records and are subject to access in accordance

with subrule (H)(8)(b)." In turn, MCR 8.119(H)(8)(b) is located under the heading

"Access to Records" and provides, "Every court shall adopt an administrative order

to . . . establish a policy for whether to provide access for records defined in subrule

(F) and if access is to be provided, outline the procedure for accessing those records."

15.     In turn, Michigan's State Court Administrative Office has

promulgated Model Local Administrative Order 8 ("Model LAO 8").[1]  Model LAO

8 covers a number of issues pertaining to public access to court records generally,

including, but not limited to, audio and video recordings of court proceedings.

16.     As it pertains to court recordings, Model LAO 8 provides Michigan's

trial courts—meaning both district and circuit courts—with a menu of options from

which each court may consider selecting.   Specifically, it offers the following

template language: "Access to court recordings . . . and other media of court

proceedings made pursuant to MCR 8.108 *[select one]* [is permitted in accordance

with this order] [is not permitted]." *Id.* ¶ 7.  It then further states:

> If the court provides access to audio or video recordings, log notes, tapes,
> discs, or any other medium used or created in the making of a record of
> proceedings and kept pursuant to MCR 8.108, outline the procedure for
> requesting access, including the amount of time to retrieve and make the
> recording available, e.g., 24 hours, and any restrictions regarding to whom

---

[1]     *Available    at*    https://www.courts.michigan.gov/4aa706/siteassets/court-administration/model-local-administrative-orders/lao8-model-rtf.rtf.

access to an audio or video recording is limited (e.g. parties in the case), viewing location, etc.

*Id.*

17.     Michigan's state trial courts (both district and circuit courts) are not required to rely upon Model LAO 8 in promulgating a policy as required by MCR 8.119(H)(8)(b), but they regularly do so.

18.     In failing to require its trial courts to follow a policy that generally allows members of the public to access court recordings, Michigan appears to be an outlier in this federal circuit.  Every other state within the Sixth Circuit's jurisdiction generally provides the public with access to court recordings, either through an explicit statute or court rule, by well-established practice, or by precedential judicial decision.[2]

### B.     Defendants' Policies Relating to Audio and Video Recordings

19.     The District Court has the most restrictive possible policy available under Model LAO 8.  The District Court policy renders *all* audio or video recordings

_____

[2] *See Waggoner v. State*, 666 S.W.3d 384 (Tenn. Ct. App. 2022) (holding that court recordings are presumptively available to the public pursuant to Tennessee's Public Records Act); Ohio Sup. Ct. Prac. R. 45(A) (requiring "court records" be presumed open to the public); Ohio Sup. Ct. Prac. R. 44(B), (C) (making clear that "court records" include documents created by courts); *State ex rel. Harmon v. Bender*, 494 N.E.2d 1135, 1137 (Ohio 1986) (holding court recordings to be open to the public under prior, but analogous, court rules); Jeremy S. Rogers, *Open Courts Compendium: Kentucky*, Reporters Committee for Freedom of the Press (July 30, 2021), https://www.rcfp.org/open-courts-compendium/kentucky/ ("Kentucky's

made by that court unavailable to the public.  Specifically, Defendant Reeds, in his administrative capacity as chief judge of the District Court, has issued Administrative Order 2024-18, which provides that "[a]ccess to court recordings . . . and other media of court proceedings made pursuant to MCR 8.108 *is not permitted*."  52nd District Court for the State of Michigan, County of Oakland, *Administrative Order 2024-18*, ¶ 7, (Oct. 29, 2024), https://www.oakgov.com/home/showpublisheddocument/24950/638658968889700 000 (emphasis added).  In turn, Administrative Order 2024-18 superseded and rescinded Administrative Order 2020-04, which contained a materially identical provision eliminating public access to court recordings.

20.     The District Court routinely creates audio recordings of its proceedings.  Those recordings are unavailable to Dr. Hallman or any other member of the public, including litigants, as the result of the District Court policy.

21.     The Oakland Circuit Court has a policy that allows the public to *view* court proceedings, but not to copy, disseminate, or share those recordings with other members of the public absent permission from a judge, which in turn requires the judge to identify "extraordinary circumstances" justifying dissemination.  *See* State of Michigan 6th Judicial Circuit, Oakland County, *Administrative Order 2021-03*, ¶

---

state court proceedings have all been recorded audio-visually (in lieu of court reporters making written transcripts) since the 1990s, and those video recordings are publicly available in the same manner as other court records.").

6.c.vi, (Mar. 3, 2021), https://www.oakgov.com/home/showpublisheddocument/ 6042/638053160137600000.

22.     Specifically, the Circuit Court policy provides that "access to video and audio records of court proceedings is only available during normal business hours" and must be requested in advance by filling out a designated form.[3]  *Id.* ¶ 6.b.vi.  It further provides that "a person will not be permitted to copy or otherwise duplicate video or audio recordings.  Attempts to copy or record video or audio records of the court will result in termination of the video session."  *Id.* ¶ 6.b.vi.d.  In addition, it states that "[c]opies of video and audio records of court proceedings will not be provided except in extraordinary circumstances and as authorized by the judge assigned to the case, pursuant to court order."  *Id.* ¶ 6.c.vi.

---

[3] In practice, as explained more fully in paragraph 40, *infra*, the Circuit Court sometimes also makes such recordings available by sending the requesting party a time-limited link by email, seemingly when the requester has a direct connection to the case in question.  When doing so, the Circuit Court admonishes recipients against copying or disseminating the recording.  However, the Court does not offer this option in most cases.  See paragraph 46, *infra*.

## II.    Dr. Hallman's Attempts to Obtain Court Records in Order to Raise Public Awareness About Judicial Conduct and the Use of Taxpayer Resources

### A.    Dr. Hallman's brother's probation case in the District Court, his subsequent civil action in the Circuit Court, and Dr. Hallman's attempts to obtain a District Court recording

23.    Dr. Hallman first became concerned about Michigan's restrictive rules on access to court recordings as a result of her brother's involvement with the legal system.  Dr. Hallman considered what happened to her brother to be both abusive and a waste of taxpayer resources, and she sought court recordings to help campaign for changes to policies she disagreed with and to hold accountable judges she considers abusive.

24.    In 2018, Dr. Hallman's brother entered a deferred guilty plea in the District Court to a misdemeanor offense for possession of marijuana, pursuant to Mich. Comp. Laws § 333.7411.  Under the terms of the plea, her brother had to spend a year on probation, and if he did so successfully, his plea could be withdrawn and the charges against him would be dismissed.  One condition of his probation was to seek substance abuse counseling and provide evidence to the District Court that he had done so.

25.    Dr. Hallman's brother attended counseling as required, but his counselor failed to provide confirmation of attendance to his probation officer in a timely manner, resulting in his receiving a probation violation notice.  Efforts by the

11

Hallmans to obtain his medical records directly from the counselor resulted in the counselor contacting the probation department, without her brother's knowledge or consent,[4] misrepresenting the situation to accuse him of threatening and harassing her.[5]

26.     On March 9, 2019, Judge Asadoorian presided over the probation violation hearing for Dr. Hallman's brother, at which her brother represented himself.   On multiple occasions when Dr. Hallman's brother attempted to fully explain the situation, Judge Asadoorian told him, "shut your mouth," and she refused to allow him to show communications between himself and the counselor (text and email exchanges) to the court that demonstrated the inaccuracy of the counselor's accusations.

27.     As a result of the hearing, Judge Asadoorian revoked Dr. Hallman's brother's deferred plea status, thus converting his offense into a permanent

---

[4] A subsequent independent investigation by the U.S. Department of Health and Human Services' Office for Civil Rights found that the counselor's office was not complying with the Health Insurance Portability and Accountability Act (HIPAA) at the time of the incident with the Hallmans, and the counselor pleaded no contest to violating Michigan's Public Health Code as a result of the incident and paid a $1,250 fine after an independent investigation by the Disciplinary Subcommittee of the Michigan Department of Licensing and Regulatory Affairs' Bureau of Professional Licensing.

[5] As discussed more thoroughly, *infra*, Dr. Hallman's brother subsequently sued the counselor for defamation and breach of contract for her actions and inactions, and the Oakland Circuit Court denied the counselor's motion to dismiss, finding significant issues of fact supported both claims.   The case subsequently settled.

conviction. She also sentenced him to five days of community service for the violation.

28. Dr. Hallman was horrified at what she found to be extremely unfair and intemperate conduct by Judge Asadoorian towards her brother during the hearing. She began inquiring within the Oakland County community, first with attorneys in consultations to file a civil action, and then with former criminal defendants, and discovered that many others had similar stories about encounters with Judge Asadoorian, as well as other judges sitting in the District Court. These conversations, coupled with her and her brother's own experience, persuaded Dr. Hallman to become civically engaged in the politics of judicial elections and judicial accountability, both locally and at a statewide level, as described in more detail below.

29. Dr. Hallman retained an attorney on her brother's behalf to file a civil action against the former counselor, alleging claims for breach of contract and defamation. During the lawsuit, one significant issue was whether the counselor's alleged inaction and defamation was the cause of an injury to Dr. Hallman's brother. In order to support the argument that the counselor's accusations had prejudicially influenced Judge Asadoordian's decision at the probation revocation hearing and to demonstrate to a jury the damages associated with the embarrassment and humiliation he endured as a result of the counselor's accusations, Dr. Hallman's

brother sought the audio recording of his probation violation hearing from the District Court via a third-party subpoena, believing it was highly probative of Judge Asadoorian's demeanor and motivation in punishing Dr. Hallman's brother.

30.     The District Court moved to quash the third-party subpoena, resulting in a motion hearing at which an attorney for Oakland County appeared and argued against disclosure of the District Court recording.  The Circuit Court granted the motion to quash, citing the District Court policy prohibiting public access to recordings.

31.     As a taxpayer, Dr. Hallman was deeply offended that taxpayer dollars were being used to pay county attorneys to argue to keep court recordings secret when those recordings were, themselves, made using taxpayer dollars.

32.     Despite quashing the third-party subpoena, on November 24, 2020, the Circuit Court issued a written decision denying the counselor's motion for summary disposition.  The decision found that Dr. Hallman's brother stated a claim that the counselor breached her contract with him by failing to provide confirmation of his attendance at counseling sessions to his probation officer, and rejected several claims for immunity asserted by the counselor.  It also found that Dr. Hallman's brother had stated a claim that the counselor defamed him by telling his probation officer that he and Dr. Hallman were "harassing" and "threatening" her, finding that some of the counselor's statements were "provable as false" and that the counselor's "omission

of key facts rendered the implications [of such statements] materially false." The decision is attached as Exhibit 1.

33.    The civil case settled for a significant sum shortly thereafter.

34.    Dr. Hallman subsequently tried to obtain the audio recording of her brother's probation violation hearing by requesting it directly from the District Court.  Among other things, Dr. Hallman hoped to publish the recording online and share it with her contacts to force a public reckoning that might cause another candidate to run against Judge Asadoorian during her next election, which was scheduled for 2024.

35.    Dr. Hallman believed, and still believes, that a recording of a judge acting intemperately and abusively towards a litigant is far more likely to evoke the public's attention, sympathy, and concern than a cold, written transcript possibly could.  A recording conveys tone, demeanor, and the lived experience of what it is like to be on the receiving end of an abuse of power in a way that transcripts do not. Furthermore, given how most people consume media in the twenty-first century, interested members of the public and voters may be induced to click on a video or audio recording of a judicial candidate—despite judicial elections being a relatively dry subject—but are almost certain not to spend time reading courtroom transcripts. Additionally, Dr. Hallman's role as a lecturer has made her acutely aware of the need

to make information accessible to those with disabilities, and recordings would allow for wider dissemination among those who may not be able to easily read a transcript.

36.    Accordingly, on April 4, 2022, Dr. Hallman requested the audio recording of the probation violation hearing via an email sent to Judge Asadoorian. Dr. Hallman's purpose for doing so was that she hoped to publicize the recordings to demonstrate to the public her belief that Judge Asadoorian was unfit for the bench, or at the very least should be challenged and defeated at the next election.

37.    That same day, Dr. Hallman received an email from the District Court's administrator denying her request because the court does not make video recordings, and the audio recordings "are not public records pursuant to the attached Local Administrative Order."  A copy of the email is attached as Exhibit 2.  Administrative Order 2020-04 was attached to the email.

**B.     Dr. Hallman's attempt to obtain video of the Circuit Court hearing at which Oakland County argued to keep the District Court's recording secret**

38.    As stated above, Dr. Hallman was disconcerted that her taxpayer dollars had been used for an Oakland County attorney to argue in the Circuit Court to keep the District Court's recordings secret.  She also believed that the demeanor, body language, and non-verbal communication between the Circuit Court judge and

Oakland County attorney at the hearing demonstrated an awareness by both that Judge Asadoorian had a reputation in the legal community for intemperance.

39.     Dr. Hallman wanted to publicize both the stated rationale for this policy as well as the court's and Oakland County's attorney's seeming awareness of Judge Asadoorian's demeanor, in an attempt to sway the public to advocate for greater transparency in the judicial branch to hold judges accountable for abusive conduct. She hoped that this would help catalyze a change in policy allowing for public access to courtroom recordings, both locally and statewide.

40.     Accordingly, on April 4, 2022, Dr. Hallman sought to obtain the video recording that was made of the Circuit Court motion-to-quash hearing by emailing a request to view the video to the Circuit Court.  In her request, she also asked for a way to view the video from home, rather than coming to the courthouse.  The next day, a member of the Circuit Court's Data Technology Unit emailed Dr. Hallman a link to view the hearing at home at a time that worked for her schedule.  The link expired within 72 hours.

41.     Dr. Hallman subsequently responded and requested permission to disseminate the video publicly, to make certain alterations to protect her brother's identity, and to truncate the video to the relevant portions of the hearing.  The Circuit Court's data technology official responded by telling Dr. Hallman she would need

to seek leave to do so by emailing the judge who had presided at the Circuit Court hearing, pursuant to paragraph 6.c.vi of the Circuit Court policy.

42.     Accordingly, on April 6, Dr. Hallman emailed then-Judge Phyllis McMillen, who had presided over her brother's civil case, requesting permission to disseminate copies of the video to the public, the media, legislators, and the Michigan Supreme Court.  She proposed to edit the video in a minimal fashion by publishing only the relevant portions and by redacting identifying information about her brother.

43.     Dr. Hallman explained the reasons for her request as follows:

I think it's really important that members of the voting public in Oakland County whose tax dollars pay for the . . . software used by the 52nd District Court understand that 'judicial discretion' regarding the adoption of reasonable regulations governing access to copies of audio/video files is being used in the 52nd District to make unilateral decisions about public access without the awareness or input from the voting public and with the express purpose of obscuring their own judicial misconduct.  The policy essentially allows judges to self-police, with consequences that are detrimental to the public and the integrity of the judiciary as a whole.  Most people do not know about these LAOs or how they are being abused, and to help the public understand this, I would like to share the video from the motion to quash hearing wherein Oakland County corporation counsel explains their rationale for failing to produce the audio file.

Specifically, I would like your permission to edit this video of the motion to quash hearing (truncate and bleep out [my brother's] identifying info, as he will be pursuing expungement) to illustrate the rationale being used to justify a lack of oversight over the 52nd District and then share the video publicly, with the media, members of the Senate and House Judiciary Committees, and with the Michigan Supreme Court to demonstrate why rules about public access should

not be left up to "judicial discretion" and why the court rule should be amended. That is, I am asking you for permission to share relevant clips - particularly of [the county corporation counsel]'s purported concerns about "protecting the records" - with various outlets. Please let me know at your soonest convenience whether I have permission.

44.    Judge McMillen responded on April 8, 2022 denying Dr. Hallman's

request.  In its entirety, Judge McMillen's response reads as follows:

> You may request a written transcript of any proceeding you wish, whether at the district court or the circuit court. As the official record of courtroom proceedings, the written transcript is the most appropriate means of your documenting anything that was said in a courtroom. It would be inappropriate for the record to be edited in any manner, and your request for a copy of the video for that purpose is denied for that reason, and for failure to present any extraordinary circumstances that establish a need for a copy of the video.

A copy of this email is attached herein as Exhibit 3.

45.    For reasons similar to those that motivated Dr. Hallman to seek the

audio recording of her brother's District Court probation violation hearing, Dr.

Hallman does not believe that a transcript can have the same political and social

impact that a recording of the Circuit Court hearing will have.  She believes that the

visual image of an Oakland County attorney arguing in favor of keeping recordings

of judicial hearings secret, as well as the demeanor of the attorney and the Circuit

Court judge when discussing Judge Asadoorian, would be a powerful one and may

change hearts and minds.  She also believes recordings can be disseminated in a

fashion that may attract attention of decision-makers and engaged members of the

public in an accessible manner.  By contrast, she—almost certainly correctly—

believes that even engaged members of the public and policymakers will not take the time to read a dry 16-page transcript of a motion-to-quash hearing, and those with disabilities may not even be able, should they want to.

### C. Dr. Hallman's additional attempts to obtain copies of other Circuit Court proceedings

46. In February 2022 and August 2022, Dr. Hallman requested video recordings of hearings from three other Oakland Circuit Court judges who were going to be on the ballot in upcoming elections. Dr. Hallman explained to court administrators the reason for her request via email: "[I]n an effort to be informed in my voting, my plan is to watch a few random videos of all of the judges in the Sixth Circuit who are up for reelection so that I might have a better understanding of how they operate on the bench." Dr. Hallman was ultimately permitted to view some videos, but the court refused her request to provide her with an email link to the videos, meaning that she was forced to come to the courthouse in person to review them, and she was not allowed to copy or disseminate them.

47. Dr. Hallman brought her two young children with her to view the videos she requested in August because it was summer, and they were not in school. During the viewing session, Dr. Hallman was able to review some videos of one judge but

did not have time to finish viewing the full video and certainly had nowhere near enough time to view videos of other Circuit Court judges.

48.    Dr. Hallman wanted to review similar videos for every judge running for election to a position on the Oakland Circuit Court.  But because the Circuit Court policy prohibits providing copies of court proceedings to interested people as a general matter, it was not practicable to do so.  Doing so would have required spending several days in a small, overheated room at the Circuit Court where the public is allowed to access video recordings, and this was not possible because of her parenting and professional responsibilities.  She therefore was forced to vote for judicial positions without fully informing herself about the judicial performance of the candidates in the ways she would have preferred.  She was also denied the opportunity to share her findings with like-minded voters, friends, and policymakers.

49.    Had Dr. Hallman been able to obtain recordings of proceedings for all judicial candidates, she would have reviewed them during her spare time in her own home.  She then would have shared some of them with members of the media if she found them concerning and would have otherwise worked to publicize what she learned through such courtwatching.  She would have also used such videos in an attempt to convince some of the many attorneys with whom she is acquainted to consider running judicial campaigns in the future.  If appropriate, she also would

have shared concerning clips with the Judicial Tenure Commission or with concerned legislators.

## III.   Dr. Hallman's Extensive Advocacy for Judicial Transparency and Accountability

50.    In addition to her attempts to obtain the recordings described above, Dr. Hallman's belief that Michigan's judicial branch is insufficiently transparent has inspired her to become an outspoken advocate regarding the issue throughout Michigan.

51.    In June 2021, Dr. Hallman participated in public comment before the Oakland County Board of Commissioners' Public Health and Safety Committee, where she stated, among other things, that

> "there has been a pattern of abuse from [the 52nd District Court] for years and it's well known in the legal community.  However, it is not well known among the general public who votes for these judges and pays for these courts because of judicial orders in place that are designed to prevent the public from accessing copies of audio and video files that would let them see and hear what's been going on for years."

52.    Dr. Hallman was later quoted by the *Detroit Free Press*, discussing the need for judicial transparency, in a 2022 article about a federal whistleblower suit by a former employee of the 52nd District Court.  *See* Bill Laytner, *Bad Judges Keep Abuse Under Wraps and Retaliate Against Critics, Lawsuit Alleges*, Detroit Free

Press (May 18, 2022),https://www.freep.com/story/news/local/michigan/oakland/ 2022/05/18/oakland-judge-kirsten-hartig-fabrizio-whisteblower/9757083002/.

53.     She also directly advocated with the Oakland Circuit Court to attempt to change their policy.  On March 16, 2021, she wrote an email to the chief judge at the time.  She received an email from the court administrator at the time making clear that the Circuit Court would maintain its existing policy.  The court administrator expressed concerns about malicious actors altering court recordings if they were allowed to be publicly disseminated and also stated that allowing public dissemination of videos would "perpetuate[] the myth that the video is the official record of court" rather than transcripts.  For these reasons, "[w]e made a choice to minimize the distribution of video recordings, nevertheless it is possible to request and receive a video recording if the judge determines that circumstances warrant its distribution. Such determinations though are intended to be few and far between for the reasons referenced in the preceding paragraphs."

54.     Dr. Hallman has also advocated for statewide reform.  She has written to legislators of both parties advocating for legislation to make court recordings public, and some of those legislators later introduced an (unsuccessful) senate bill with bipartisan sponsorship addressing this issue.  She later sought the State Bar of Michigan's support for this bill and in 2023, she participated in public comment before the State Bar of Michigan's Board of Commissioners regarding its position

with respect to reforming Michigan's rules governing public access to court recordings. She has also testified at a public administrative hearing of the Michigan Supreme Court about court rules governing judicial transparency.

55. Dr. Hallman's interest in judicial transparency is an outgrowth of both her personal experiences described above and her interests as an academic in the fields of psychology and social work. As an instructor in these fields, she has long studied civil engagement and social responsibility, and she has published about the need for conscientious students to have an "understanding [of] the function and structure of governments and how to influence change within them."[6]

56. Indeed, since becoming focused on advocating for judicial transparency, Dr. Hallman has also begun to study related themes professionally. In January 2025, she shared research at a conference of the Society for Social Work and Research in Seattle. The title of her study was "Democratizing Court-Watching in the Digital Age: Exploring Individual Court Policies Regarding Access to Audio/Video Recordings in Michigan." Her presentation detailed how she obtained the policies of 149 courts throughout Michigan, assigning them anywhere between

---

[6] *See* Samantha K. Hallman, *Development and Assessment of Student Social/Civic Responsibility and Ethical Reasoning*, Engaged Learning: Transforming Learning for a Third Century, Paper No. 5, p. 3, University of Michigan, Center for Research on Learning and Teaching (2016), https://files.eric.ed.gov/fulltext/ED573980.pdf.

0 to 6 points for transparency.[7]  Dr. Hallman's findings were that 58% of Michigan's state courts received 0 points (meaning their recordings were kept completely secret), and an additional 14% received only 1 point (meaning that they allowed viewing of recordings but not copying or dissemination).

57.    Dr. Hallman has also been active in judicial elections, including for positions in district courts, circuit courts, and the Michigan Court of Appeals.  She has collected signatures and actively campaigned for multiple judicial candidates both in Oakland County and elsewhere. She has passed out signs and literature for candidates for Oakland County Probate Court and for the District Court.

58.    In the event that the District Court's prohibition on obtaining and disseminating recordings is struck down, Dr. Hallman intends to occasionally request audio recordings of public hearings that take place in the District Court and to disseminate some recordings to policymakers and/or voters.

59.    As stated above, if Dr. Hallman were granted permission to copy and disseminate Circuit Court proceedings, she would also review a cross-section of proceedings for every candidate for a seat on that court in future elections, both to inform herself as a voter about the candidates, and to engage in public advocacy on

---

[7] A court received 1 point if recordings were accessible to be viewed or listened to on its website, 2 additional points if copies could be obtained, and 3 additional points if those copies could be disseminated.

behalf of, or in opposition to, candidates she believed particularly meritorious or concerning, respectively.

**IV.    When Court Recordings *Are* Made Available to the Public in Michigan, They Have Contributed in Critical Ways to Promoting Transparency, Accountability, and a More Just Judiciary.**

60.    It is a simple fact, deeply ingrained in the way that human beings process information, that recordings of what happens in court convey nuance of tone and demeanor that cannot be captured in a transcript.  A picture—or a video—is worth a thousand words.[8]

61.    By definition, all non-verbal communication is lost in a transcript, as are many verbal elements such as inflection, tone, pacing/pauses, uncertainty, and so on.  This is why trial courts, which actually experience testimony, make credibility findings, and it is also why appellate courts typically defer to those findings.[9]

---

[8] *See, e.g.*, *Fields v. Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017) (noting that "videos have helped police departments identify and discipline problem officers"); *ACLU of Ill. v Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012) ("'[A]udio and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating news and information about events that occur in public.").

[9] *See, e.g.*, *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) ("[A] reviewing court, which analyzes only the transcripts . . . is not as well positioned as the trial court is to make credibility determinations."); *Peveler v. United States*, 269 F.3d 693, 702 (6th Cir. 2001) ("We are generally reluctant to set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness on the stand and assess his demeanor."); *Franklin v. Bradshaw*, 2009 WL 649581, at *15

62.    A recent example in Michigan is illustrative.  In 2021, a district court judge in Hamtramck berated and threatened to jail a 72-year-old cancer patient who was ticketed for overgrown weeds in his lawn—weeds he had not been able to maintain due to the treatment he was receiving for cancer.  The incident garnered significant statewide media attention after a recording of the hearing was made public.  Notably, the recording was likely made in contravention of the Hamtramck district court's policy against recording proceedings, which was and remains similar to the 52nd District Court's policy.  This video therefore would not have been released to the public and gone viral had someone not recorded and disseminated it in contravention of the district court's policy.  The video "showed [the cancer patient] appearing to wheeze and gasp for breath as he tried to explain to the judge he was ill."[10]

63.    As a result, the judge in question reported herself to Michigan's Judicial Tenure Commission, publicly apologized, and was censured by the Hamtramck city council.  A transcript would not have shown this individual wheezing and gasping,

---

(S.D. Ohio 2009) (recognizing that "[a] witnesses' gestures, body language, facial expression, eye contact, inflection, and general demeanor are not communicated . . . by a transcript of the proceedings").

[10] Niraj Warikoo, *Hamtramck City Council Censures Judge for Scolding Cancer Patient*, Detroit Free Press (Jan. 26, 2022), http://freep.com/story/news/local/michigan/wayne/2022/01/26/hamtramck-council-censures-judge-berating-cancer-patient/9229778002/.

and it is simply implausible to believe that this judge's conduct would have become a matter of public attention were it not for the fact that courtroom video was made available to the public online.

64.    Consider another example from last year, when Judge Kenneth King of Detroit's district court made national news when he berated a 16-year-old youth on a field trip to his courtroom for falling asleep while he was talking to the collected students.  Judge King then proceeded to have the youth placed in a jail uniform and handcuffed and threatened with incarceration in front of her peers.  Judge King was subsequently removed temporarily from the bench and required to attend training, and he ultimately returned to the bench in a different role—now assigned to the traffic court instead of the criminal court.  It is unlikely this incident would have made national news, and had the impact it did, had video recordings of the proceedings not gone viral with the visceral image of a tired student in handcuffs being shamed by a judge in front of her peers.  Indeed, in reporting on the incident, the *New York Times* emphasized that Judge King's "comments were captured on video."[11]  Local reporting, similarly, led with video of the incident and was able to

---

[11] Annie Correal, *Judge Who Had Teenager Handcuffed on Field Trip Is Temporarily Removed from Docket*, The New York Times (Aug. 15, 2024), https://www.nytimes.com/2024/08/15/us/detroit-judge-sleeping-teen.html.

report on it the day it happened thanks to video being recorded and made available to the public.[12]

65.   The Michigan judiciary's own handling of cases involving judicial misconduct demonstrates the role that recordings play in illuminating what really happens in Michigan courtrooms.  The Michigan Supreme Court's description of judicial misconduct in one of its opinions reflects an understanding that judicial demeanor matters in ways that often are not captured by a transcript—in a case involving an Oakland Circuit Court judge, no less.[13]  The same is true of reports

---

[12] *See, e.g.*, *Detroit Judge Scolds Teen During Court Field Trip, Places Her in Uniform,* WXYZ-TV Detroit (Aug. 13, 2024) https://www.youtube.com/watch?v=CEY5EqxCxOE.

[13] *See In re Gorcyca*, 902 N.W.2d 828, 610, 615 (Mich. 2017) (noting the role review of video played in disciplinary hearing involving a judge, where one issue was the significance of the judge's use of a hand gesture that seemed to indicate that she was mocking a litigant's mental capacities).

In *Gorcyca*, Oakland Circuit Court Judge Lisa Gorcyca had presided over a divorce and custody proceeding during which, among other things, she admonished and held in contempt a youth who did not want to spend time with his father and refused to talk to him during parenting time and sentenced the youth to time in "Children's Village," stating, among other things that "[y]ou are a defiant, contemptuous young man"; "you are so mentally messed up right now and it's not because of your father." *Id.* at 603.  She then told the youth's younger (9-year-old) sibling, "I know you're kind of religious.  God gave you a brain.  He expects you to use it.  You have a brain, you are not your brother. . . . Do you want to live in jail?  Just tell me this right now?" *Id.* at 605.  After the middle brother then indicated that he would prefer to be detained with his older brother than engage in further visitation with their father, and was sentenced to time at Children's Village as well, the judge ironically told the two

29

from the Judicial Tenure Commission.[14]

66.    For these and other reasons, the Conference of State Court Administrators has encouraged courts to "provide transparency in more cases."[15] The report further recommends that "[c]ourts should make court processes as transparent as possible so the average person can witness the judicial system in action" and that "[a] highly effective way to do this is to proactively take steps to disseminate information."[16]

---

sentenced children: "One day you can watch this video and realize that you two have been brainwashed. . . . And wipe that smirk off your face." *Id.* at 607.  Pursuant to the Circuit Court policy, the children in fact would *not* be permitted to obtain and review their own copies of the courtroom video and at most could only have reviewed it by coming to the Circuit Court in person.  Nor could Dr. Hallman have obtained the recording and shared it with the public during Judge Gorcyca's re-election campaign in 2024.

[14] *See* Judicial Tenure Commission, *Annual Report 2021* (May 27, 2022), p 20, https://cms4files.revize.com/mjtc/annual_report/docs/2021%20Annual%20Report.pdf (documenting disciplinary recommendations involving a judge who used a "brusque and dismissive tone" during informal proceedings involving a traffic ticket).

[15] Conference of State Court Administrators, *Courting Public Trust and Confidence: Effective Communication in the Digital Age* (2023), p 15, https://cosca.ncsc.org/__data/assets/pdf_file/0020/86015/COSCA-Policy-Paper-Courting-Public-Trust.pdf.

[16] *Id.*

**V.    The Burden on Courts of Providing Public Access to Recordings of Court Proceedings That Already Exist Would Be Minimal.**

67.    All state courts in Michigan already use some kind of software or technology to record on-the-record proceedings.  Most use products purchased from either Justice AV Solutions (JAVS) or BIS Technology Group.

68.    Once electronically stored recordings are already held by a court, the cost of duplicating those recordings and providing them to interested members of the public is minimal, and such costs as do exist are easily recouped through the imposition of reasonable fees.

69.    It is, therefore, perhaps unsurprising that some courts in Michigan provide ready access to court recordings.  For example, the district and circuit courts in Van Buren County provide free access to view recordings of public court proceedings within 3 business days (or up to 10 business days if the recording is located in off-site storage).  They also allow any member of the public to obtain copies of such recordings within 3 business days (or 7 business days if the recording is stored off-site) upon payment of a $20 charge per CD or flash drive.[17]

---

[17] *See* State of Michigan Van Buren County Courts, *Local Administrative Order C36 2020-05J, D07 2020-03J, P80 2020-03J: Access, Inspection, Reproduction and Creation of Court Records* (Mar. 4, 2020), https://www.vanburencountymi.gov/DocumentCenter/View/418/LAO-C36-2020-05J-D07-2020-03J-P80-2020-03J---Access-Inspection-Reproduction-and-Creation-of-Court-Records-PDF.

70.    As another example, the Genesee Circuit Court has made recordings of its proceedings automatically available to parties and presumptively available to the public and media upon the filing of a motion, pursuant to local administrative order number 2024-04J and 2020-10J prior to that.  In correspondence with Dr. Hallman in 2021, that court's administrator indicated that the Genesee Circuit Court fields between three to four requests for recordings per week, each of which takes approximately 20 minutes of staff time to complete.  The administrator also indicated that the $20 per-request fee charged by the circuit court covers the costs of the media used to transmit the recording.  These costs could likely be reduced even further by emailing the videos to interested parties.

71.    The lack of burden reflected in providing access to court recordings is also demonstrated by Dr. Hallman's inquiries in other jurisdictions.  During a writing retreat to rural Kentucky in June 2024, Dr. Hallman took the opportunity to visit the local county courthouse in Lee County.  As indicated above, Kentucky has provided public access to court recordings for decades.  Dr. Hallman filmed a short interview with the court clerk in which the clerk demonstrated the process for producing a copy of a recorded court proceeding from the time of request to the time of completion.  In all, it took less than five minutes to produce a copy of a recorded proceeding.  For extended-length proceedings, the clerk indicated that the actual burning of the proceeding onto a CD can take longer, but the user does not need to

be actively monitoring the copying process while it occurs.  The Lee County court uses the same recording and data storage software (JAVS) as many Michigan courts.

72.     Dr. Hallman created this video to use in her advocacy with policymakers to demonstrate the ease with which court recordings can be requested and provided to interested members of the public.

## CLAIMS FOR RELIEF

## COUNT I

### Unconstitutional Denial of Public Access to Court Records in Violation of the First Amendment and 42 U.S.C. § 1983 (Against District Court Defendants)

73.     Plaintiff repeats and re-alleges all of the allegations above.

74.     The First Amendment requires that court proceedings and court records presumptively be open and available to the public when (1) the place or process the public seeks to access has historically been open to the press and/or public and (2) public access plays a significant positive role to the functioning of the judicial system.   In answering these questions, particularly when confronted with new technology, courts must look for historical analogs and do not simply assume that access to records or courtrooms that rely upon new technology are not covered by the First Amendment right of access.

75.     Historically, courts have been as open to the public as technology at the time would permit.  It has long been considered a civic *obligation* of the citizenry to

attend and become informed of court proceedings.  Before the Norman Conquest, attendance at trials was actually compulsory for freedmen.   And in the early American republic, attendance in person at court was widespread and a common way of passing time.

76.    In modern times, attendance at court during the day is unrealistic for the vast majority of the public.  In the middle of the twentieth century, the news media, particularly local media, became the primary means through which members of the public who wished to be informed about what was occurring in the judicial branch could attempt to keep track and be informed about the third branch of our democracy.  However, in recent years, a collapse of traditional media has left over 65 million Americans with one or no local newspapers to keep them apprised of what is happening in local courtrooms.  Fortunately, hearing and viewing court proceedings through recordings of those proceedings *is* now possible, and it is the closest modern analog to the storied tradition of the citizenry remaining informed about the activities of the judiciary through in-court attendance.

77.    Accordingly, the District Court's policy of denying access to all members of the public to review all its court recordings is unconstitutional on its face and violates Dr. Hallman's (and everyone else's) First Amendment right to access court records.

78.     In promulgating and maintaining the District Court policy, Defendant Reed is acting in his administrative and official capacity as chief judge of the District Court and, therefore, is subject to being enjoined by this Court.  In the alternative, he is subject to declaratory relief pursuant to 42 U.S.C. § 1983.

79.     In enforcing the District Court policy by denying recordings to an individual who was not party to the underlying proceeding, Judge Asadoorian, in her official capacity, was acting in an administrative capacity and, therefore, is subject to being enjoined by this Court.  In the alternative, Judge Asadoorian is subject to declaratory relief pursuant to 42 U.S.C. § 1983.

## COUNT II

**Unconstitutional Denial of Right to Copy and Publicly Disseminate Publicly Available Court Records in Violation of the First Amendment and 42 U.S.C. § 1983 (Circuit Court Defendant)**

80.     Plaintiff repeats and re-alleges the allegations above.

81.     The First Amendment renders prior restraints presumptively unconstitutional.

82.     A government order not to copy or disseminate publicly available information is a prior restraint.  Accordingly, prohibitions on disseminating public information are subject to strict scrutiny and can stand only if they are narrowly tailored to achieve a compelling governmental interest.

83.     As detailed above, the Circuit Court makes recordings of its court proceedings available to the public for viewing onsite at the courthouse but imposes a presumption that such videos may not be copied or disseminated.  The Circuit Court policy therefore constitutes a prior restraint on the dissemination of publicly available information and is subject to strict scrutiny.

84.     The Circuit Court policy cannot survive strict scrutiny.  The fact that it *presumptively* bans dissemination and publication of recordings definitively demonstrates that the policy is not narrowly tailored to accomplish any governmental interest, let alone a compelling one.

85.     Accordingly, the Oakland Circuit Court's policy of presumptively denying the public the right to copy and disseminate videos of court proceedings is unconstitutional on its face and violates Dr. Hallman's (and everyone else's) First Amendment right to disseminate court records.

86.     In maintaining and enforcing the Circuit Court policy, Defendant Matis is acting in his administrative and official capacity as chief judge of the Circuit Court and, therefore, is subject to being enjoined by this Court.  In the alternative, he is subject to declaratory relief pursuant to 42 U.S.C. § 1983.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff asks the Court to:

87.  Enter judgment in favor of Plaintiff and against Defendants;

88. Enter a declaratory judgment declaring that:

    A.   The District Court policy violates the First Amendment by rendering sealed and secret court records that the First Amendment requires be generally available to the public; and

    B.   The Circuit Court policy violates the First Amendment by imposing an unconstitutional prior restraint upon the dissemination of recordings otherwise in the public domain;

89. Issue an injunction prohibiting Defendants from enforcing the District Court policy and the Circuit Court policy, respectively, and requiring Defendants to provide Dr. Hallman with the recordings she has already requested, as well as with any recordings she may request in the future unless the recorded hearings were not open to the public or have been sealed as otherwise permitted by law;

90. Award Plaintiff attorney fees and other litigation costs and expenses pursuant to 42 U.S.C. § 1988, Fed. R. Civ. P. 54(d), and any other applicable law; and

91. Grant such other relief the Court may deem just and proper.

Respectfully submitted,

/s/Philip E. Mayor
Philip E. Mayor
Daniel S. Korobkin
American Civil Liberties Union
  Fund of Michigan

2966 Woodward Avenue
Detroit, MI  48201
(313) 578-6800
pmayor@aclumich.org
dkorobkin@aclumich.org

*Attorneys for Plaintiff*

Dated: April 2, 2025