## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SAMANTHA HALLMAN,

     Plaintiff,

 v.

Hon. TRAVIS REEDS, in his official capacity as
Chief Judge of Michigan's 52nd District Court;
Hon. LISA L. ASADOORIAN, in her official
capacity as a judge of the third division of
Michigan's 52nd District Court; and Hon.
JEFFERY S. MATIS, in his official capacity as
Chief Judge of Michigan's Sixth Circuit Court,

     Defendants.

Case No. 2:25-cv-10939

Hon. Brandy R. McMillion

**ORAL ARGUMENT
REQUESTED**

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... iii

CONCISE STATEMENT OF ISSUES PRESENTED ............................................. vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................ viii

INTRODUCTION ....................................................................1

FACTUAL OVERVIEW ...........................................................2

I.   The District Court and the Circuit Court Both Maintain Policies that Deny Public Access to Recordings of Court Proceedings....................................2

II.   Dr. Hallman Is an Advocate for Judicial Transparency Who Was Denied Full Access to Court Recordings by Both Courts. ....................................3

LEGAL STANDARD FOR A MOTION TO DISMISS ...........................................6

ARGUMENT ....................................................................6

I.   The District Court Policy Is an Unconstitutional Restriction on the First Amendment Right of Access to the Courts. ...................................6

  A.   Courts apply the two-step "experience and logic" test to First Amendment access to courts claims. ..................................................6

  B.   Access to taxpayer funded recordings of courtroom proceedings satisfies the experience and logic test. ................................................9

    1.   The experience prong is satisfied by ancient legal traditions of expecting citizens to observe trials as directly as possible............................9

    2.   The logic prong is satisfied because access to recordings of court proceedings promotes and encourages public engagement with the judiciary. ....................................................13

II.   Defendants Offer No Argument for Dismissal of Count II, Which Alleges that the Circuit Court's Ban on Duplicating and Dissemination Recordings Is an Unconstitutional Prior Restraint. .............................................22

III.   Defendants' Cursory Abstention Arguments Are Meritless. .....................24

CONCLUSION .....................................................................25

# TABLE OF AUTHORITIES

## Cases

*ACLU of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ...............................15

*Application of Nat'l Broadcasting Co.*, 828 F.2d 340 (6th Cir. 1987)................8, 21

*Banks v. Manchester*, 128 U.S. 244 (1888)...............................................12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).......................................6

*Brown & Williamson Tobacco Corp. v FTC*, 710 F.2d 1165 (6th Cir. 1983) ......9, 10

*Browne v. Cumming* (1829) 109 Eng. Rep. 377 (KB) .............................11

*Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)..........................................24

*Cincinnati Gas & Elec. Co. v. Gen. Elec. Co.*, 854 F.2d 900 (6th Cir. 1988) .........21

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)............................18

*Courthouse News Serv. v. Planet*, 947 F.3d 581 (9th Cir. 2020)..............................7

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975).......................................23

*Daubney v. Cooper* (1829) 109 Eng. Rep. 438 (KB)...............................11

*Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) ......................... passim

*Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223 (6th Cir. 2005)................................6

*Fields v. Philadelphia*, 862 F.3d 353 (3d Cir. 2017)...............................15

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)....................................14

*Fisher v. King*, 232 F.3d 391 (4th Cir. 2000) ..........................................20

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982) ..9, 18

*Habich v. City of Dearborn*, 331 F.3d 524, (6th Cir. 2003) ............................. 24, 25

*Hartford Courant Co. v. Pellegrino*, 380 F.3d 83 (2d Cir. 2004) ............... 16, 21, 25

*In re Boston Herald, Inc.*, 321 F.3d 174 (1st Cir. 2003) ......................................8, 21

*In re Disclosure of Juror Names & Addresses*, 592 N.W.2d 798 (Mich Ct. App. 1999) ...............................................................................18

*In re Gorcyca*, 902 N.W.2d 828 (Mich. 2017) ........................................15

*In re Oliver*, 333 U.S. 257 (1948) .............................................................8

*In re Search of Fair Finance*, 692 F.3d 424 (6th Cir. 2012) .......................... 7, 8, 21

*In re Sony BMG Music Ent.*, 564 F.3d 1 (1st Cir. 2009) .........................................22

*Kleindienst v. Mandel*, 408 U.S. 753 (1972)..............................................17

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ...............................23

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350
    (1989)........................................................................................24

*Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978) ...........................19

*Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503 (6th
    Cir. 2001) ................................................................................22

*Press-Enterprise Co. v. Superior Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1
    (1986) (*Press-Enterprise II*) .................................................. 6, 7, 14, 20

*Press-Enterprise v. Superior Court of Cal., Riverside Cnty.*, 464 U.S. 501
    (1984) (*Press-Enterprise I*)..................................................................7, 18

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ....................... passim

*Smith v. Daily Mail Publ'g. Co.*, 443 U.S. 97 (1979)..............................23

*Soderberg v. Carrion*, 645 F. Supp. 3d 460 (D. Md. 2022) .............................. 23, 24

*Soderberg v. Carrion*, 999 F.3d 962 (4th Cir. 2021).................................23

*Stevens v. Mich. State Ct. Admin. Off.*, No. 21-1727, 2022 WL 3500193 (6th
    Cir., Aug. 18, 2022) ...........................................................................9, 22

*United States v. Alvarez*, 567 U.S. 709 (2012).........................................17

*United States v. Beckham*, 789 F.2d 401 (6th Cir. 1986) ........................20

*United States v. McDougal*, 103 F.3d 651 (8th Cir. 1996)......................20

*Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16 (2d Cir. 1984)..............22

*Wheaton v. Peters*, 33 U.S. 591 (1834)...................................................12

*Younger v. Harris*, 410 U.S. 37 (1981) ...................................................24

**Treatises**

3 William Blackstone, *Commentaries* .....................................................20

**Other Authorities**

2 E. Coke, *Institutes of the Laws of England* (6th ed. 1681) ...................10

ABA Criminal Justice Standards (approved Aug. 2013) .........................17

Christian Goede, *A Foreigner's Opinion of England* (Horne trans. 1822).............11

Clara Hendrickson, Local Journalism in Crisis, Brookings Inst. (Nov. 12, 2019)....................................................................................13

George Orwell, *Nineteen Eighty-Four* (1949).........................................17

Judicial Tenure Comm'n, *Annual Report 2024* (May 20, 2025) ........................4, 16

Judith Reznick, *Bring Back Bentham: "Open Courts," "Terror Trials," and Public Sphere(s)*, 5 Law & Ethics Hum. Rts. 2 (2011) ..................................11, 17

Keith A. Gorgos, Comment, *Lost in Transcription: Why the Video Record is Actually Verbatim*, 57 Buff. Law Rev. 1057 (2009)..............................................14

Mich. Continuing Judicial Education Rules (updated Jul. 2, 2025) .......................15

Pollock, *English Law Before the Norman Conquest,* 1 Select Essays in Anglo-American Legal History 88 (1907) ...........................................10

Steven Smith, *Kudzu in the Courthouse: Judgements Made in the Shade*, 3 Fed. Cts. L. Rev. 177 (2009) ...............................................11

Taylor Jones et al., *Testifying While Black: An Experimental Study of Court Reporter Accuracy in Transcription of African American English*, 95 Language e216 (2019)....................................................16

Thomas Smith, *De Republica Anglorum* (Alston ed. 1972)....................................10

## CONCISE STATEMENT OF ISSUES PRESENTED

1. Plaintiff has asserted a First Amendment claim that the public has a right to access taxpayer-funded recordings of court proceedings.  The Supreme Court has announced a two-step "experience and logic" test that is a "test of general applicability for making th[e] determination" of when judicial proceedings or records must be accessible to the public.  *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) (discussing *Press-Enterprise Co. v. Superior Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1 (1986) (*Press-Enterprise II*)).  Should this Court analyze Plaintiff's claim under *Press-Enterprise II*?

   Plaintiffs' answer:          Yes.

   Defendants' answer:        No.

2. Assuming *Press-Enterprise II* applies, has Plaintiff stated a claim that public access to court recordings satisfies the *Press-Enterprise II* test?

   Plaintiffs' answer:          Yes.

   Defendants' answer:        No argument offered.

3. Assuming, *arguendo*, that Plaintiff's lead claim fails, Count II of her complaint asserts a claim that the Oakland Circuit Court's policy of allowing the public to view court recordings, but not copy and disseminate them, is an unconstitutional prior restraint. Should Count II be dismissed?

   Plaintiffs' answer:          No.

   Defendants' answer:        No argument offered regarding Count II.

4. The *Burford* and *Younger* doctrines provide that federal courts should abstain from certain matters that require them to make difficult determination of state law or interfere with ongoing state law matters. Here, the Court is asked to determine whether a state court policy is consistent with the United States Constitution, and there is no ongoing state proceeding where this question could be answered. Should this court abstain?

Plaintiffs' Answer:        No.

Defendants' Answer:        Yes.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

- **Supreme Court cases concerning the First Amendment right of access to judicial proceedings**:  *Press-Enterprise Co. v. Superior Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1 (1986) (*Press-Enterprise II*); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).

- **Sixth Circuit cases applying *Press-Enterprise II***:  *In re Search of Fair Finance*, 692 F.3d 424 (6th Cir. 2012); *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002); *Application of Nat'l Broad. Co.*, 828 F.2d 340, 344 (6th Cir. 1987); *Stevens v. Mich. State Ct. Admin. Off.*, No. 21-1727, 2022 WL 3500193 (6th Cir., Aug. 18, 2022).

- **Prior Restraint Issue (Count II)**:  *Soderberg v. Carrion*, 999 F.3d 962 (4th Cir. 2021).

- **Abstention Issues**: *Habich v. City of Dearborn*, 331 F.3d 524 (6th Cir. 2003); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 101 (2d Cir. 2004).

## INTRODUCTION

Transparency and accountability are the cornerstones of a functioning judicial system. That is why the Supreme Court has held that the First Amendment guarantees the public the right to access courts. The right includes access to court documents and records, and it is a bedrock principle undergirding our democracy.

Plaintiff Samantha Hallman ("Dr. Hallman") is a judicial transparency advocate. She challenges policies promulgated by Michigan's 52nd District Court ("the District Court") and Oakland Circuit Court ("the Circuit Court") that severely restrict Michiganders' access to taxpayer-funded audio and video recordings made of each court's proceedings. By denying the public access to these accurate depictions of judicial proceedings, these courts undermine the public's ability to participate in, and hold accountable, the third branch of our democracy.

Courts apply a two-prong "experience and logic" test to determine when the First Amendment right of access to court proceedings attaches. The test asks whether the proceeding has traditionally been open to the public (experience) and whether the type of public access demanded plays a significant positive role in the judicial system (logic). Both tests are easily satisfied here.  As to experience, as far back as the Norman Conquest, freemen were expected to attend trials in person as part of their civic duty, and it has long been an Anglo-Saxon legal principle that the public was granted the most access logistically and technologically plausible at the time to

1

review judicial proceedings. As to logic, the daily demands of life make it impossible for most Michiganders to attend proceedings in person, but by reviewing recordings of proceedings, they can become fully and accurately informed of what happens in Michigan's courtrooms and hold their elected officials accountable.

Defendants largely rely on cases involving public access to trial *exhibits*. These inapposite cases do not involve access to recordings of actual trials or hearings and are grounded in cases pre-dating the Supreme Court's announcement of the experience and logic test. Defendants also offer no argument to dismiss Count II of Dr. Hallman's complaint, which alleges that the Circuit Court's policy is an unconstitutional prior restraint because it allows the public to *view* recordings, but not to copy or disseminate them without special permission from a judge. Finally, Defendants' abstention arguments, made in a single paragraph, are as meritless as their cursory treatment suggests. Their motion to dismiss should be denied.

## FACTUAL OVERVIEW

I.    **The District Court and the Circuit Court Both Maintain Policies that Deny Public Access to Recordings of Court Proceedings.**

Many states, including every other state within the Sixth Circuit, allow public access to most audio and video recordings of courtroom proceedings. Compl. ¶18, ECF No. 1, PageID.8. Michigan, however, does not have a uniform statute or court rule addressing when the public is entitled to access, copy, or disseminate such recordings. Compl. ¶13, ECF No. 1, PageID.6. Instead, every court adopts its own

2

policy regarding access to court recordings. Compl. ¶14, ECF No.1, PageID.6-7.

The District Court routinely creates audio recordings of its proceedings. Compl. ¶20, ECF No. 1, PageID.9. However, the District Court policy, articulated in its Administrative Order 2024-18, renders all audio or video recordings made by that court unavailable to the public. Compl. ¶19, ECF No. 1, PageID.8-9.

For its part, the Circuit Court policy, per Administrative Order 2021-03, allows the public to view court recordings during business hours by advance request. Compl. ¶¶21-22, ECF No. 1, PageID.9-10. However, the public may not copy, disseminate, or share those recordings with other members of the public absent permission from a judge, for "extraordinary circumstances" shown. *Id.*

## II.     Dr. Hallman Is an Advocate for Judicial Transparency Who Was Denied Full Access to Court Recordings by Both Courts.

Dr. Hallman has an extensive record of advocacy for judicial transparency and accountability, including by communicating with the media, lobbying the Circuit Court and state legislators, contributing to public comment and testimony, and being active in judicial elections. Compl. ¶¶50-57, ECF No. 1, PageID.22-25. Her requests for court recordings from the District Court and Circuit Court are part of her ongoing advocacy efforts. Compl. ¶¶28-49, ECF No. 1, PageID.13-22. She recognizes that court recordings convey tone, demeanor, and the lived experience of how judges comport themselves in a way that court transcripts cannot. Compl. ¶35, PageID.15-16. She also recognizes that recordings increase accessibility and are more likely

3

than transcripts to engage the public's attention, thus driving policy reforms and interest in judicial elections. Compl. ¶¶35, 45, ECF No. 1, PageID.15-16, 19-20.

Dr. Hallman first requested a court recording from the District Court following her brother's experience in Judge Asadoorian's courtroom as detailed more fully in the Complaint, and in the facts section of Dr. Hallman's response to Defendants' Motion to Dismiss Judge Asadoorian. *See* Compl. ¶¶24-37, ECF No. 1, PageID.11-16; ECF No. 17. During the hearing in question, Judge Asadoorian presided over Mr. Hallman's probation revocation hearing—a hearing that is not at issue in *this* lawsuit—and repeatedly told him to "shut his mouth" and would not allow him to present evidence of why his probation should not be revoked.[1] Compl. ¶26, ECF No. 1, PageID.12. Dr. Hallman sought the recording both to support a subsequent (ultimately successful) lawsuit her brother filed against a third party involved in the probation hearing, and to inform the public about Judge Asadoorian's conduct in order to encourage voters to choose a different judge during 2024 elections. Compl. ¶¶29, 34, 36, ECF No. 1, PageID.13-16.

Dr. Hallman has also attempted to obtain and disseminate videos of various hearings in the Circuit Court and has been restrained from doing so by the Circuit

---

[1] Michigan's Judicial Tenure Commission ("JTC") issued a report describing this incident, and others involving Judge Asadoorian. See Judicial Tenure Comm'n, *Annual Report 2024*, 25-26 (May 20, 2025), *available at* https://tinyurl.com/vnkm35mm. The report does not expressly name Judge Asadoorian, but it describes the incident with Mr. Hallman verbatim.

4

Court's policies. First, in the civil case her brother filed in the Circuit Court relating to his probation hearing, he filed a third-party subpoena seeking the District Court's recording of that probation hearing, which he planned to use as evidence. Compl. ¶29, ECF No. 1, PageID.13-14. The District Court moved to quash the third-party subpoena, which resulted in a motion hearing after which the motion to quash was granted. Compl. ¶30, PageID.14. On April 4, 2022, Dr. Hallman emailed a request to view the video of the motion-to-quash hearing and was sent a link to view the hearing that expired within 72 hours. Compl. ¶40, PageID.17.

However, the Circuit Court policy prohibited editing or disseminating the video without permission from the presiding judge, so Dr. Hallman emailed the Circuit Court judge requesting permission to disseminate the video publicly and to make alterations to protect her brother's identity and truncate the 20-minute video only to the relevant parts. Compl. ¶¶41-42, ECF No.1, PageID.17-18. The Circuit Court judge denied Dr. Hallman's request. Compl. ¶44, ECF No. 1, PageID.19.

Dr. Hallman wanted to publicize the recording because it shed light on how the District Court's policy can conceal judicial misconduct. Compl. ¶43, PageID.18-19. Dr. Hallman hoped to encourage the public to advocate for greater judicial transparency. Compl. ¶39, ECF No. 1, PageID.17. And, as a taxpayer, Dr. Hallman wanted to demonstrate to others how their tax dollars were being used not only to create records to which they are denied access, but also to pay counsel to defend this

5

obfuscatory policy. Compl. ¶¶2-3, ECF No. 1, PageID.2-3.

Dr. Hallman subsequently sought other videos from the Circuit Court of three judges standing for re-election in 2022. She was allowed to view some videos in person at the courthouse, but the Circuit Court refused to provide her with an email link to view them at home, limiting her access, and it would not allow her to copy or disseminate the videos to the voting public. Compl. ¶46, ECF No. 1, PageID.20.

## LEGAL STANDARD FOR A MOTION TO DISMISS

A complaint need only state a claim "that is plausible on its face" and "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the pleader." *Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 228 (6th Cir. 2005).

## ARGUMENT

**I. The District Court Policy Is an Unconstitutional Restriction on the First Amendment Right of Access to the Courts.**

**A. Courts apply the two-step "experience and logic" test to First Amendment access to courts claims.**

The United States Supreme Court has long recognized that the public has a qualified First Amendment right of access to trials. *See Press-Enterprise Co. v. Superior Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1 (1986) (*Press-Enterprise II*). This right extends to numerous contexts, such as "civil trials, administrative hearings, deportation proceedings, and municipal planning meetings." *In re Search*

6

*of Fair Finance*, 692 F.3d 424, 429 (6th Cir. 2012); *see Detroit Free Press v. Ashcroft*, 303 F.3d 681, 695 & n.11 (6th Cir. 2002) (collecting cases); *accord Courthouse News Serv. v. Planet*, 947 F.3d 581, 590 (9th Cir. 2020) (same).

Under *Press-Enterprise II*, "cases dealing with the claim of a First Amendment right of access" to a court proceeding or process, require courts to consider "two complementary considerations": (1) "whether the place and process have historically been open to the press and general public" and (2) "whether public access plays a significant positive role in the functioning" of the judicial system  478 U.S. at 8. In formulating this test, *Press Enterprise II* expressly relied on Justice Brennan's concurrence in the judgment in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), a case that produced no majority opinion. *See Press Enterprise II*, 478 U.S. at 8 (citing *Richmond Newspapers,* 448 U.S. at 589 (Brennan, J., concurring in the judgment)); *see Detroit Free Press*, 303 F.3d at 700 (recognizing that *Press-Enterprise II* adopted much of Justice Brennan's concurrence). Once the right of access attaches, infringements of the right can survive only if they are "essential to preserve higher values and [are] narrowly tailored to serve that interest." *Press-Enterprise II*, 448 U.S. at 9 (quoting *Press-Enterprise v. Superior Court of Cal., Riverside Cnty.*, 464 U.S. 501, 510 (1984) (*Press-Enterprise I*)).

This test is known as the "'experience and logic' test." *Detroit Free Press*, 303 F.3d at 695; *Application of Nat'l Broadcasting Co.*, 828 F.2d 340, 344 (6th Cir. 1987)

(*NBC*). It is a "test of general applicability for making th[e] determination" of which information implicates the right. *Detroit Free Press*, 303 F.3d at 700; *see id.* at 694. It has "broad application" and "has been further extended . . . to determine whether there is a First Amendment right of access to documents and other materials." *Fair Finance*, 692 F.3d at 429-30; *accord In re Boston Herald, Inc.*, 321 F.3d 174, 182 (1st Cir. 2003). Thus, the test must be used to assess whether a First Amendment right attaches to any *particular* type of document, record, or proceeding that courts might attempt to shield from public view.

This right reflects the fact that "[o]penness in judicial proceedings promotes public confidence in the courts." *NBC*, 448 U.S. at 347. It recognizes that the First Amendment "embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a *structural* role to play in securing and fostering our republican system of self-government." *Richmond Newspapers*, 448 U.S. at 587 (Brennan, J. concurring). Open trials are "bulwarks of our free and democratic government" because "contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *Id.* at 592 (quoting *In re Oliver*, 333 U.S. 257, 270 (1948)). Thus, the right of access is "bottomed upon a keen appreciation of the structural interest served in opening the judicial system to public inspection." *Id.* "Judges know that they will continue to be held responsible by the public for their rulings" and those rulings "will be more

readily accepted, or corrected if erroneous, if the public has an opportunity to review the facts presented to the court." *Brown & Williamson Tobacco Corp. v FTC*, 710 F.2d 1165, 1178 (6th Cir. 1983). This will "minimize judicial error and misconduct." *Id.*

### B.     Access to taxpayer funded recordings of courtroom proceedings satisfies the experience and logic test.

#### 1.     The experience prong is satisfied by ancient legal traditions of expecting citizens to observe trials as directly as possible.

Under the "experience" prong of the *Press-Enterprise II* test, a plaintiff must demonstrate that the type of court hearing to which access is sought is one with a "tradition of accessibility." *Detroit Free Press*, 303 F.3d at 701 (quoting *Richmond Newspapers*, 448 U.S. at 589 (Brennan, J., concurring)). However, because "the First Amendment concerns 'broad principles,'" the test is "applicable to contexts not known to the Framers." *Id.* (quoting *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 604 (1982)). Thus, as the Sixth Circuit explained, in essentially inviting a lawsuit just like this one, "Courts often consider historical analogues when applying well-established doctrines to novel technologies." *Stevens v. Mich. State Ct. Admin. Off.*, No. 21-1727, 2022 WL 3500193, at *6 (6th Cir., Aug. 18, 2022) (collecting Supreme Court cases).

Centuries of Anglo-Saxon law demonstrate that the relevant tradition here is not simply that the public has a right to know what happens in court. Rather, the public

9

is expected to be able to observe what has happened in court *to the maximum degree practicable at a given time*. In *Richmond Newspapers*, a trial court closed a courtroom pursuant to a state statute allowing closures when both the defendant and prosecution agreed to do so. In holding the closure had been unconstitutional despite the parties' agreement, Chief Justice Burger's plurality opinion explained that "[w]hat is significant for present purposes is that *throughout its evolution*, the trial has been open to *all* who care to observe." 448 U.S. at 564 (emphasis added).

In fact, prior to the Norman Conquest, it was "compulsory" for freemen to attend "moots," which were the equivalent of criminal trials. *Id* at 565. (citing Pollock, *English Law Before the Norman Conquest,* 1 Select Essays in Anglo-American Legal History 88, 89 (1907)). As the jury system evolved, compulsory attendance "was relaxed" but the public was still "'left to their own liberty'" to attend and view trials. *Id.*, quoting 2 E. Coke, *Institutes of the Laws of England* 121 (6th ed. 1681). Thus, the right to view a trial was "enjoyed at will by members of the community." *Brown & Williamson*, 710 F.3d at 1178. It was considered particularly important that "so manie" members of the public "as will or can" actually "heare from the mouth of the depositors and witnesses what is saide" in court. *Richmond Newspapers*, 448 U.S. at 566 (quoting Thomas Smith, *De Republica Anglorum* 101 (Alston ed. 1972)) (emphasis omitted). One foreign observer explained, "[t]he publicity of [Anglo-Saxon judicial] proceedings is indeed astonishing. *Free access to the courts is*

10

*universally granted.*" *Id.* at 570, quoting Christian Goede, *A Foreigner's Opinion of England* 214 (Horne trans. 1822). These practices reflect that "the appearance of justice can best be provided by allowing people to observe it." *Id.* at 571-72 (cleaned up).

The right of access extended to documents recording what happened in court. As explained by a former federal magistrate judge, "[p]erhaps the earliest recorded challenge to access" involved judicial denials of public access to felony indictment records because of a perception that the public was misusing the records. Steven Smith, *Kudzu in the Courthouse: Judgements Made in the Shade*, 3 Fed. Cts. L. Rev. 177, 187-88 (2009) (discussing *Browne v. Cumming* (1829) 109 Eng. Rep. 377, 378 n.2 (KB)). The King's Bench struck down this restriction on public access. *Id.*

This tradition of openness was "also an attribute of the judicial systems of colonial America." *Richmond Newspapers*, 448 U.S. at 567 (quoting *Daubney v. Cooper* (1829) 109 Eng. Rep. 438, 440 (KB)); *see* Judith Reznick, *Bring Back Bentham: "Open Courts," "Terror Trials," and Public Sphere(s)*, 5 Law & Ethics Hum. Rts. 2, 7-10 (2011). Consistent with this tradition, the 19th century Congresses ordered not just that judicial records be made public, but obligated federal court clerks to "prepare and keep . . . convenient indices and cross-indices of the judgement records of said courts . . . [which] shall at times be open to the inspection and examination of the public." Smith, 3 Fed. Cts. L. Rev. at 193 (citing 25 Stat. 357

(1888)). And the Supreme Court held that reporters of court decisions could not copyright their works and thus restrict public access to them. *Wheaton v. Peters*, 33 U.S. 591 (1834). Public access extended to the "*whole work* done by the judges" which "is free for publication to all." *Banks v. Manchester*, 128 U.S. 244, 253 (1888) (emphasis added).

    *Richmond Newspapers* recognized that nature of access evolves with time:

> In earlier times, both in England and America, attendance at court was a common mode of passing the time. With the press, cinema, and electronic media now supplying the representations or reality of the real life drama once available only in the courtroom, attendance at court is no longer a widespread pastime. Yet it is not unrealistic even in this day to believe that public inclusion affords citizens a form of legal education and hopefully promotes confidence in the fair administration of justice. Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media. . . . This contributes to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system.

448 U.S. at 572-73 (cleaned up).

    This "unbroken, uncontradicted history," *id.* at 573, strongly supports the existence of an evolving historical practice of expecting courts to make available to the public information that allows the public to observe, to the degree technologically feasible, what actually happens in courts. As *Richmond Newspapers* recognized, it is no longer plausible or customary for people to regularly attend court in person to observe court proceedings as they happen, and the relevant historical

traditions must be understood in the context of evolving times and technology. In much of the twentieth century, this meant that the press had to serve as the primary intermediary through which the public could observe court proceedings. *See Richmond Newspapers*, 448 US at 573.

But with the evolution of widespread court recording technology, that capability has, in a sense, returned to the public. At the same time, a collapse of local media means that local reporting often no longer exists. See, e.g., Clara Hendrickson, *Local Journalism in Crisis*, Brookings Inst. (Nov. 12, 2019) (noting that over 65 million Americans have zero or one local paper), https://perma.cc/6XGW-VMXH. Because in-person court attendance remains impractical for most, reviewing recordings of court proceedings may be the best, if not *only*, way for any informed Michigander who wishes to remain apprised of what happens in courtrooms to do so. Notably, both the Court of Appeals for the Sixth Circuit and the Supreme Court record and publish recordings of their hearings online. In short, the hoary Anglo-Saxon legal history of encouraging the public to observe what happens in courtrooms strongly supports a finding, under the "experience" prong of the *Press-Enterprise II* test, that the public has a First Amendment right of access to court-made audio and video recordings of court proceedings.

       **2.**      **The logic prong is satisfied because access to recordings of court proceedings promotes and encourages public engagement with the judiciary.**

The second step of the *Press-Enterprise II* test asks whether the requested form of public access would "play a significant positive role in the functioning" of the judiciary. *Press-Enterprise II*, 478 US at 8. The answer to this question is "yes" as applied to court recordings.

"[T]he availability of a trial transcript is no substitute for a public presence at the trial itself" because the "'cold' record is a very imperfect reproduction of events that transpire in the courtroom." *Richmond Newspapers*, 448 U.S. at 597 n.22 (Brennan, J., concurring). All non-verbal communication is lost in a transcript, including "paralanguage" (things like intonation, emphasis, and silences) and "kinesics," (things such as body movements and hand gestures). Keith A. Gorgos, Comment, *Lost in Transcription: Why the Video Record is Actually Verbatim*, 57 Buff. Law Rev. 1057, 1058-60 (2009); *see* Compl., ¶61, ECF No. 1, PageID.26-27. Yet "[s]tudies indicate that sixty to ninety-three percent of [a] communication is composed of [such] nonverbal information." Gorgos, 57 Buff. Law Rev. at 1058-60; *see also id.* at 1059 n.5 (citing sources). Limiting public access to this rich vein of information contravenes the maxim that "the First Amendment . . . prohibit[s] government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978).

Denying access to court recordings also undermines the public's ability to monitor and assess the performance of elected judges and prosecutors. One cannot

14

deny that the demeanor with which such officials interact with the public is a qualification that is of interest to voters. Indeed, Michigan judges are required to take six hours of training in integrity and *demeanor* annually. Mich. Continuing Judicial Education Rules, Rule 4(B)(1) (updated Jul. 2, 2025). And, again, transcripts do not suffice to convey this information. Cf. *Fields v. Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017) (noting that "videos have helped police departments identify and discipline problem officers"). Rather, "audio and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating news and information about events that occur in public." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012).  For example, a Hamtramck judge was recently held to account for berating a 72-year-old cancer patient for not weeding his lawn after a court recording was made public showing the man "appearing to wheeze and gasp for breath as he tried to explain to the judge he was ill." Compl., ¶62, ECF No. 1, Page ID.27. Notably, the recording was likely made in violation of the district court's policy, which was identical to the one challenged here.

Similarly, the Michigan Supreme Court analyzes tone and body language when considering complaints of judicial misconduct. *See In re Gorcyca*, 902 N.W.2d 828 (Mich. 2017) (noting a judge's hand gesture that seemed to mock a litigant's mental capacities). The same is true of Michigan's Judicial Tenure Commission. A recent report *discussing the very hearing from which Dr. Hallman seeks a recording*, in

15

which Judge Asadoorian repeatedly told Dr. Hallman's brother to "shut his mouth," also documented several other instances in which same judge "allowed their emotions to govern what they said in the courtroom *and the tone of voice they used to say it*." Judicial Tenure Comm'n, *Annual Report 2024*, pp 25-26 (May 20, 2025), https://tinyurl.com/5n977ehk (emphasis added).

Furthermore, transcripts can obscure the role that race may play in judicial proceedings. Recent studies have shown that transcripts involving racial minorities who speak non-standard dialects are less accurate and that, when confronted with non-standard dialects, court reporters "fell well below their certified 95-98% transcription accuracy, could not accurately paraphrase what they had heard, and generally held negative beliefs about 'Ebonics' and about African Americans." See Taylor Jones et al., *Testifying While Black: An Experimental Study of Court Reporter Accuracy in Transcription of African American English*, 95 Language e216, e217 (2019) (Ex 1). Thus, allowing the public to view court recordings may help to illuminate (and hopefully reduce) racial disparities in the courtroom. *See Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 95 (2d Cir. 2004) (recognizing the logic test favors access where records "reveal potential judicial biases or conflicts of interest").

Similarly, public access to court recordings does not just hold judges accountable. It also "teach[es] that conflicts do not belong exclusively to the disputants or to the

government[;]" access "give[s] the public a place in which to interpret, own, or disown what has occurred" in court. Reznick, 5 Law & Ethics Hum. Rts. at 56.

This all explains the American Bar Association's model standards for criminal proceedings. They provide that "the public presumptively should have access to all judicial proceedings, related documents and exhibits, and *any record* made thereof not otherwise required to remain confidential." ABA Criminal Justice Standards, Standard 8-5.2 (approved Aug. 2013), https://tinyurl.com/yspwdvr8 .

Although they do so in a section that does not actually concern the First Amendment issue, Defendants offer policy arguments that could bear on the logic prong of the analysis. Def. Br. at 16-20, ECF No. 15, PageID.152-56. Each argument is undercut by Supreme Court precedent.

Defendants argue that court recordings could be altered to present a false impression of what happened in Court. But the First Amendment's response to the possibility of dishonest speech is not censorship; it is more speech. "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (citing George Orwell, *Nineteen Eighty-Four* (1949)); *Detroit Free Press*, 303 F.3d at 683 ("The Framers of the First Amendment 'did not trust any government to separate the true from the false for us.'" (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 773 (1972)). "[I]t is our law and our tradition that more speech, not less, is the governing rule." *Citizens*

17

*United v. Fed. Election Comm'n*, 558 U.S. 310, 361 (2010).

Defendants argue that releasing court recordings could result in jurors or witnesses being threatened or traumatized. To be sure, such concerns may be significant in any individual case, but they can and should be dealt with individually. "The Government offers no persuasive argument as to why [its] concerns cannot be addressed on a case-by-case basis." *Detroit Free Press*, 303 F.3d at 707. Similarly, as to jury selection, the Supreme Court has expressly held that it is presumptively open to the public and juror privacy concerns must be addressed case-by-case.[2] *Press-Enterprise I*, 464 U.S. at 512-13. The same is true in cases involving sexual offenses and minors. *See Globe Newspaper*, 457 U.S. at 609 (1982) (holding that the state's interest in protecting child victims "could be served just as well by requiring the trial court to determine on a case-by-case basis whether the State's legitimate concern for the well-being of the minor victim necessitates closure").

Finally, Defendants argue that real-time access to court recordings could allow sequestered witnesses to see what happens in court. This is a red herring. The claim here is that the public must be able to obtain copies of *recordings* that have been *previously* made by the court; not that live broadcasting is required.

Thus, the logic test favors a First Amendment right of access to court recordings.

---

[2] Furthermore, in Michigan, juror lists are already presumptively subject to release under the public right of access. *See In re Disclosure of Juror Names & Addresses*, 592 N.W.2d 798, 808 (Mich Ct. App. 1999).

### C. The cases relied upon by defendants are distinguishable, and none involve requests for access to recordings of court proceedings.

Defendants offer no reason the policies challenged here could survive First Amendment scrutiny if First Amendment right of access attaches. Their only argument is that there is no First Amendment right to access recordings of court proceedings in the first place. Def. Br. at 7-13, ECF No. 15, PageID.143-49. That argument, which does not even cite or acknowledge *Press-Enterprise II*, fails.

Primarily, Defendants rely on *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) and cases applying *Nixon*. In *Nixon*, which preceded *Richmond News* and *Press-Enterprise*, media sought to duplicate audio tapes of Richard Nixon that were played at a Watergate-era criminal trial. *Id.* at 594. Transcripts of the tapes were made public, but the tapes were not. *Id.* The media asserted that it had a First Amendment right to access the tapes under the "freedom of the press" clause. *Id.* at 608. The Supreme Court disagreed because the *public* lacked physical access, and the press had "no right to information about a trial superior to that of the general public." *Id.* at 609. No claim was made as to whether *the public* has a First Amendment right access to the tapes. Next, the Supreme Court rejected the argument that the *Sixth Amendment* required publication of the tapes holding that the Sixth Amendment does not require trials to be "recorded and broadcast." *Id.* at 610.

*Nixon* is inapplicable for several reasons. First, it did not address the scope of the *public's* First Amendment right of access at all, holding merely that the *freedom of*

19

*the press* clause did not grant the *media* preferential access and that the Sixth Amendment right to a public trial did not require publication of the tapes.

Second, *Nixon* involved requests to access *evidence*. It did *not* involve, as this case does, a request for access to recordings of public proceedings themselves, made by the courts, at public expense. This distinction is critical. As discussed above, making court recordings public promotes observation of the judiciary and thus enhances democracy. Unlike inspecting a particular piece of evidence, watching a recording of a proceeding allows the public to assess and learn from the performance of elected officials. Completely unlike the claim in *Nixon*, the claim here seeks to realize the longstanding goal of the First Amendment right of access that judicial proceedings happen "in the presence of all mankind." *Richmond Newspapers*, 448 U.S. at 597 (Brennan, J., concurring) (quoting 3 William Blackstone, *Commentaries* \*373); *Press-Enterprise I*, 464 U.S. at 508 (recognizing that the right of access is rooted in the principle "that *anyone* is free to attend" trials). Defendant's reliance on *United States v. Beckham*, 789 F.2d 401 (6th Cir. 1986), *Fisher v. King*, 232 F.3d 391 (4th Cir. 2000), and *United States v. McDougal*, 103 F.3d 651 (8th Cir. 1996), is misplaced for the same reason.

*Beckham* is inapposite for another reason. It was decided *before Press-Enterprise II* distilled the First Amendment right of access into the "experience and logic" test that incorporated Justice Brennan's *Richmond Newspapers* concurrence. While dicta

20

in *Beckham* might suggest that the right does not attach to recordings, any such dicta (which only discussed discrete recordings entered into evidence anyhow) is superseded by the Sixth Circuit's repeated holding, post-*Press-Enterprise II*, that *Press-Enterprise II* announced a "test of general applicability" for First Amendment right of access claims. *Detroit Free Press*, 303 F.3d at 700; *id.* at 694; *see Fair Finance*, 692 F.3d at 429 (test applies to a "wide variety of . . . contexts"); *Cincinnati Gas & Elec. Co. v. Gen. Elec. Co.*, 854 F.2d 900, 903 (6th Cir. 1988); *accord Boston Herald*, 321 F.3d at 182; *Hartford Courant*, 380 F.3d at 93 (noting *Nixon* was "decided before the Court had established the existence of a qualified First Amendment right" of access it "has, therefore, not impeded the circuits in their efforts to derive historical support for the public availability of certain judicial documents in the American common law heritage"); *id.* at 91 (collecting cases).

The Sixth Circuit's first post-*Press-Enterprise II* decision demonstrates this point. In *NBC*, media sought access to live hearings *and* transcripts *and* records from pretrial proceedings. 828 F.2d at 341-42. Applying *Press-Enterprise II*, the panel held that there was a First Amendment right of access to the "documents and records." *Id.* at 345. *The dissent* cited *Beckham* for the claim that there is "no first amendment right to inspect and copy judicial records or documents." *Id.* at 351 (Ryan, J., dissenting). But that view did not prevail. That is why, in essentially inviting this *exact* lawsuit, the Sixth Circuit stated, "[o]ur precedent . . . compels us

21

to consider [the] two [*Press-Enterprise II*] questions." *Stevens*, 2022 WL 3500193, at *5.

None of Defendants' cases provide a reason not to apply the *Press-Enterprise II* test here.[3] Thus, their motion must be denied.

## II. Defendants Offer No Argument for Dismissal of Count II, Which Alleges that the Circuit Court's Ban on Duplicating and Dissemination Recordings Is an Unconstitutional Prior Restraint.

Assuming, *arguendo*, that it is constitutional to entirely deny the public access to recordings of court proceedings, Count II separately alleges that the Circuit Court's policy of making recordings available to the public, but prohibiting their copying and dissemination, constitutes an unconstitutional prior restraint. Defendants have offered no specific arguments as to why this Count should be dismissed, so their motion should be denied as to Count II. But in an abundance of caution, Dr. Hallman addresses the unique reasons the Circuit Court policy is unconstitutional here.

A "prior restraint" includes "administrative and judicial orders that block expressive activity before it can occur." *Polaris Amphitheater Concerts, Inc. v. City*

---

[3] Other authorities upon which Defendants rely are even less relevant and easily dispensed with. For example, *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16 (2d Cir. 1984), is pre-*Press Enterprise II*. And it involved a request to affirmatively film and live broadcast a trial—a situation completely distinct from this case. So did *In re Sony BMG Music Ent.*, 564 F.3d 1 (1st Cir. 2009)—which also involved no First Amendment claim.

*of Westerville*, 267 F.3d 503, 506 (6th Cir. 2001). "Truthful reports of public judicial proceedings have been afforded special protection" against suspect prior restraints. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

The Fourth Circuit applied these principles in a highly analogous case in *Soderberg v. Carrion*, 999 F.3d 962 (4th Cir. 2021). There, a Maryland statute prohibited broadcasting court recordings of state criminal proceedings that were available to the public. The Fourth Circuit held that the statute was subject to strict scrutiny under the First Amendment because it punished "publishing information released to the public" via court records. *Id.* at 964. In so holding, *Soderberg* relied heavily upon *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) (striking down a ban on conveying information from court documents "in the public domain") and *Smith v. Daily Mail Publ'g. Co.*, 443 U.S. 97 (1979) (striking down a ban on publishing the names of juvenile offenders). *Soderberg* applied these precedents to conclude that once a court recording is available to the public, limitations on disseminating those records are subject to strict scrutiny. 999 F.3d at 969. On remand, the trial court then held that the Maryland statute could not survive such scrutiny. See *Soderberg v. Carrion*, 645 F. Supp. 3d 460 (D. Md. 2022).

In so holding, the *Soderberg* trial court recognized that limitations on *live* broadcasts are often constitutionally permissible to protect against public attention biasing ongoing court proceedings but held that restrictions on the *subsequent*

23

dissemination of court recordings at a later date were not similarly justified. *Id.* at 483. It also explained that an anti-dissemination policy would not protect witnesses in a meaningful way because bad actors who are motivated enough to threaten a witness could view the videos directly; narrower means of protecting witnesses were available, such as redacting sensitive information on a case-by-case basis. *Id.* at 490.

So too here. The Circuit Court allows the public to view recordings and (sometimes) provides remote access. However, it prohibits using one's own devices to duplicate those records or share them with other members of the public. Just as in *Soderberg*, the Circuit Court's policy constitutes a prior restraint. Defendants have offered no argument (nor could they) how such a prior restraint could overcome strict scrutiny.  Thus, Defendants' motion must be denied as to Count II.

## III.    Defendants' Cursory Abstention Arguments Are Meritless.

In a single paragraph, Def. Br. at 21, ECF No. 15, PageID.157, Defendants suggest that this suit is barred by both *Burford* and *Younger* abstention (citing *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) and *Younger v. Harris*, 410 U.S. 37 (1981)). These drive-by arguments are meritless.

*Burford* abstention allows federal courts to abstain from certain cases in which they would need to rule on certain "difficult questions of state law." *Habich v. City of Dearborn*, 331 F.3d 524, 532 (6th Cir. 2003) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989)). But it is "inapplicable"

in cases, like this one, that do "not concern a disputed issue of state law, but rather a potential conflict between state and federal [] laws," particularly when the question is whether the state law "violate[s] constitutional limits." *Id.* at 533.

*Younger* abstention is even less relevant. It applies in certain instances where a federal plaintiff asks a federal court to rule on an issue that they have an "opportunity" to raise in an ongoing state case. *Id.* at 531. It does not apply where, as here, the federal plaintiff has *no* ongoing state case in which to raise the claim and cannot be used where a plaintiff could arguably file a new lawsuit in state court instead. *See id.* Here, Dr. Hallman has never filed any lawsuit whatsoever in state court about this matter, so there is no predicate state proceeding to justify *Younger* abstention. *See, e.g.*, *Hartford Courant*, 380 F.3d at 101 (declining to abstain from challenge to a state court rule prohibiting access to court documents).

## CONCLUSION

For these reasons, the motion to dismiss should be denied.

Respectfully submitted,

s/ Philip Mayor
Philip Mayor (P81691)
Bonsitu Kitaba-Gaviglio (P78822)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Avenue
Detroit, MI  48201
(313) 578-6800
pmayor@aclumich.org
*Attorneys for Plaintiff*

Dated: July 21, 2025